May it please the court and counsel, I'm Jim Westwood, attorney for Tillamook County Creamery Association. With me at council table is Jim Edmonds. This is a case that comes before the court on summary judgment, which means the standard of review is essentially a de novo one and that the inferences from the evidence need to be drawn, of course, in favor of my client, the non-moving party, Tillamook County Creamery Association. Tillamook Country Smoker, which I'll refer to as Smoker in my argument as we did in the briefs, brought this action and affirmatively claimed estoppel by latches in its complaint. In deciding the case on summary judgment, the district court committed one fundamental mistake, which was viewing use of a mark as enough to begin the latches clock running rather than the infringing use of the mark. There is ample evidence in the record to indicate that infringement was not a problem until at the earliest 1997, perhaps 1998. The notice of infringement was given by my client, Creamery Association, in 2000. In about 1996 to 1998, Smoker began its whole new look initiative, and one of the big things that changed was the primary channels of distribution of its product. Up until that time, for 20 years, the Smoker products had been distributed essentially to convenience stores, taverns, but at that point, Smoker expanded its presence in grocery stores dramatically and in club warehouse stores so much so that between 1998 and 2002, there was actually a 40-fold increase. Now, this was viewed by the district court in its summary judgment ruling as normal business expansion. I submit that the inference to be drawn can very readily be that this was indeed a whole new look and that even if the court could find that there was a latches problem, the progressive encroachment would have been occurring. Now, another key to a progressive encroachment defense is the likelihood of confusion, and the evidence of public confusion of the two marks ramped up dramatically. Now, one of the points Smoker made at trial was, well, Creamery, you didn't even start keeping track of complaints until 1998. True enough. What happened in 1998? A couple of complaints. 1999, a few more. 2000, dramatically more, and continuing to increase. The point being that a fact finder could readily infer from the evidence that the inclusion of Smoker's products in grocery stores around the country for the first time between roughly 1997 to 2000 was a major factor in the infringement calculus. The two products. I have a question. Yes, sir. In the earlier period before Smoker changed its marketing technique, is it correct that some of its distribution was through independent distributors who put the product into supermarkets? Correct. That's right, Your Honor. Why wouldn't that have raised the same issue at that time? It was a matter of volume. The amount, and even the district court itself said that Smoker's products found their way into supermarkets. We don't deny they were there. What we do deny is that they were there in any significant quantity. Again, the sales from 1998 to 2000 went from roughly 190,000 to more than 7 million. That's quite a change. And it also coincides with this whole new look initiative that Smoker brought about during that period. So, yes, they were in the stores, Your Honor. We don't deny it. But the point that I want to make is that the head-to-head competition was not occurring until much later. But your failure to object to it at the time, you know, early on, isn't that at your own peril? Aren't you running a risk that they're not going to have their product take off? The time to complain about it was early on, not after they become successful. Well, the question is, when was the infringing use occurring? When did we discover that it was an infringing use? Now, the fact that they were using the word Tillamook, I mean, Tillamook Pharmacy, Tillamook Chevrolet, I don't know that there is such a thing, but it's a geographic attribution, so that's not a problem necessarily. And the fact, too, that Tillamook is a small town, and that Smoker was selling its products largely locally, but also in other distribution channels, but not on the scale that they did later. These were all things, of course, of which Creamery was aware. The question, though, becomes, at what point does it become an infringing use? Does scale affect whether a use is infringing? I understand how scale might affect the motivation of Creamery to complain, but does it really affect whether there's an infringing use under the sleek craft factors, under that AMF case? Under the sleek craft factors, which, indeed, we must be looking at, Your Honor, the scale is the ‑‑ well, I read from the sleek craft factors here, the marketing channels used. Now, the mere use of a marketing channel, if it's insignificant, I suggest is de minimis, such as grocery stores, warehouse stores. What we have here is the use of a marketing channel in a whole new way, greatly expanded. Thank you. There's also the evidence of confusion that is created by having the product more widely distributed, and the confusion was occurring. Confusion is a factor in determination of latches, because, as this Court has said, you can't have an injunction when there's been a finding of latches, so I suggest that it follows automatically, because an injunction requires confusion, evidence of confusion, that the latches finding itself must have that factor in it as well. And we did have evidence of public confusion. Not really much at all, in fact, no evidence at all before 1997, and a little bit starting about the time that, again, the expansion, the great expansion of its presence was occurring. And the confusion was of different sorts. Distributors, grocers, for example, these national grocery chains in which Smoker was now distributing its products for the first time in any large way, were saying to Creamery, well, we have to deduct some of what we're paying you because of this product that Smoker was selling us that was perhaps not up to snuff. Or we had members of the public, the Montana school teachers, who complained to Creamery that it was selling beef chunks in a small round tin resembling a smoking tobacco container, things of that nature, showing that the confusion of the public was redounding in some very clear respects to the detriment of Creamery. These are infringing uses. I'm sorry. I'm finished. Finish your sentence. That was it. I finished. Okay. What should we make of the period of time when the relationships between Smoker and Creamery were more pleasant, and including, for example, Creamery's own catalog listing Smoker's products, and at least in one series of catalogs describing a Smoker product as our product. Yes. A Creamery product. The court may make something of that, as a fact finder would as well, and I suggest that that's something that we would have to deal with at a trial. I would, although this goes outside the record, I'd invite the court to visit the town of Tillamook. It's not very large. Creamery is certainly the largest presence in the town. It needs to be a good citizen, and the accommodation to Smoker of marketing its products through the factory store, I suggest is something that a fact finder, again, could find is perfectly normal in a situation such as we have in Tillamook and in Tillamook County. Would you say a word, Mr. Westwood, about the request for admission? Yes, I'd love to say something about that, Your Honor. The Creamery's supposed judicial admission, which the district court construed as saying that Smoker's marks are not confusingly similar to Creamery's, is simply off point. What Creamery was saying was that there was no infringing use before about 1998. In what way was there no infringing use? I'm sorry? In what way was there no infringing use? Did it become an infringing use in 1998? I'm sorry. In what way was it not infringing until 1998? Not infringing. I'm sorry. Because of, as I've indicated earlier, the new look that Tillamook Creamery brought about, the extent that it was marketing its products in new channels where it had not significantly been before, and, in fact, even to the extent of using the name Tillamook much more prominently. So is your admission an admission that there was no likelihood of confusion until 1998? No, certainly not. And that is exactly where the district court made its mistake. If you'll look at our reply brief, page 28, I think we say it better than I can on my feet here, the logical fallacy of assuming that if there was no infringement before 1998, there could not have been a likelihood of confusion is the problem for the court. I may be selling products in Portland, Oregon, someone else selling confusingly similar products in Portland, Maine, but until we both open a store in St. Louis, there may not be infringement. That's my point. I see I have about five minutes remaining. If the court has no questions, I'll reserve the remainder of my time for rebuttal. I don't see any other. You have a little under five minutes left if you choose to use it for rebuttal. Thank you for your argument. Counsel? May it please the court. I'm Peter Staples for Tillamook Country Smoker. With me at counsel table is Brenna Ligard. We have a demonstrative exhibit that was used at both summary judgment hearings that I'd like to use today. Does opposing counsel have any objection? Okay. When the district court began its analysis of latches, it began with the observation that the doctrine of latches requires a consideration of the circumstances of each particular case and a balancing of the interests and equities of the parties. This sometimes gets lost, particularly in Creamery's arguments, where it takes quotations from other cases that have very dissimilar equities and factual circumstances. The equities here are that Creamery consented to and actively encouraged smokers' use of Tillamook Country Smoker for 25 years. The harm to Creamery of continued use of Tillamook Country Smoker by a smoker is minimal, whereas the harm to the smoker of an injunction against continued use of the market as used since 1976 would be devastating. I think the circumstances and equities presented here have more in common with Dwinell White v. Whitehouse than they do with Sara Lee v. Kaiser Roth, and the remarks of learned hand are more pertinent to the situation here than the remarks of the court in Sara Lee. The inequitable and cynical nature of Creamery's position is plainly stated in Note 11 on page 57 of their opening brief. Creamery states, Even as to smokers' marks used before 1998-2000, Creamery's position was that the marks in and of themselves were potentially confusingly similar to Creamery's marks, but there was no likelihood of substantial consumer confusion because of different marketing channels. Creamery candidly admits that it stood by silently for 25 years knowing that smokers' marks were potentially confusing, that's their words, potentially confusing, while assuring Smoker that Creamery had no objections and encouraging smokers' use of its mark. The elements of latches are unreasonable delay by senior user of the trademark resulting in prejudice to the junior user. The two types of prejudice are economic and evidentiary. Smoker disagrees with Creamery about the standard review. I think it's fairly clear, it's very clear, that Jaro and Grupo Gigante established that this court uses a mixed standard of review when considering the summary judgment of latches. Whether the district court improperly resolved disputed issues of material fact are reviewed de novo. Whether latches is a proper defense to trademark infringement is reviewed de novo. However, the district court's applications of the latches factors on summary judgment  The latches factors were adopted by this court in E-Systems v. Monotech in 1983 and were recently confirmed by the court in Grupo Gigante. As applied to the situation here, the latches factors are strength of Creamery's mark, Creamery's diligence in enforcing its mark, harm to Creamery if injunctive relief is denied, smoker's good faith in adopting its mark, competition between the parties, and harm to smoker caused by Creamery's delay. The district court's findings with respect to these factors should be reviewed for clear error or abuse of discretion. Both Jaro and Grupo Gigante say so. For example, when Jaro upheld the district court's refusal to grant an injunction in the public interest, it referred to its deferential standard. As a moving party, smoker bore the initial burden of proof that there was no genuine issue of material fact. However, Creamery's 25-year delay exceeded any analogous statute of limitations and the delay is presumably unreasonable. Creamery bears the burden of somehow showing that the delay was reasonable. Creamery attempts to do so by arguing that smoker's conduct changed to create a likelihood of confusion where none existed before. The district court properly examined smoker's conduct before and after 1997 to determine whether that conduct created a likelihood of confusion. The district court's examination of the past and present conduct is an effective and efficient way of determining latches. Creamery asserts that the district court was required to perform comparative likelihood of confusion analyses. Such a process would be burdensome on the court, ineffective to determine whether there was a likelihood of confusion in the distant past and unfair to smoker. A post hoc likelihood of confusion inquiry would, in effect, put the burden on smoker to prove that it infringed prior before it could assert latches as a defense. This would make latches too dangerous for a junior user such as smoker to assert and render it a spineless defense warned against by Jarrow. Their argument is that during the earlier period leading up to, say, 1999-2000, it was simply not a problem. There wasn't widespread competition in large markets. They were happy to have smokers selling its product in its way and were reasonably satisfied it was not harmful. Then there was this huge expansion in terms of markets and availability. What's your response to that? First of all, the parties have never been in competition. If the parties were in competition, Creamery would have never sold smoker's goods in its store. As you can see from the timeline, smoker really didn't have a new look, which emphasized Tillamook. It had been emphasizing Tillamook at various periods over the 25 years. So when it came out with what's called the key label, it wasn't changed at all from the past. In fact, in order to try to make peace with Creamery, it needed to reduce the size of Tillamook. That's their last label there. But Creamery said, no, you've got to stop using Tillamook altogether. The change in grocery stores, it doesn't establish. It's not the kind of change which shows confusion is more likely. In fact, the judge even said, assuming smoker was not in grocery stores, I still find there's no progressive encroachment because the parties have been in common channels of trade for all these years when smoker's products were sold in Creamery's store, its catalog, and on its website. The court also noted that in terms of confusion, confusion was more likely when the products were co-marketed than when they're marketed in grocery stores. Now, as Mr. Westwood was forced to admit, smoker has been in grocery stores since the very beginning. Helen Ganger's declaration establishes that. Smoker's past president, Harold Shields, acknowledged that Creamery carried smoker's product to market for 10 years or so. So Creamery's progressive encroachment argument is really post hoc rationalization for its unreasonable delay. What did their request to admit actually admit, as you see it? The request was to admit that smoker's actions prior to the late 90s, 1995 to 2000, didn't violate Creamery's rights. Now, the reason it used the words didn't violate is because Creamery had two counterclaims, one for trademark infringement and one for dilution. The issue for trademark infringement is likelihood of confusion. So when Creamery, in its own words, said that there was no likelihood of confusion until, or there was no problem until the late 90s, it essentially acknowledged, not essentially acknowledged, it acknowledged there was no likelihood of confusion prior to 1997. And while that admission helped them when they were trying to make their progressive encroachment argument and helped them, you know, to try to show that their delay was not unreasonable, it turned around and bit them when they, in the registration process. Because the test for registration is exactly the same as the test for trademark infringement, and that is likelihood of confusion. Creamery tries to introduce some confusion, if you'll pardon me, here by talking about potentially confusingly similar. Well, confusingly similar is not the test. The test for both registration and trademark infringement is likelihood of confusion. So when it said there was no likelihood of confusion before 1998, it was acknowledging that the marks that had been used in the past were not likely to cause confusion. And the marks that are the subject of registration are the ribbon logo, that it refers to the military, and there were stolen country smoker. Smoker had used both those marks well in advance of the late 90s. I think the important – there's no – Let me see if I understand your argument on the request for admission. Are you saying that their response basically gave the case away? The response gave the registration case away. Because it was made for the purpose of trying to avoid latches, they either didn't consider registration important or didn't see the effect of the admission on the registration issue. So the admission did give the registration case away. Conclusively established, there was no likelihood of confusion prior to 1997. Do you have any further questions? I don't see any. Counsel, thank you for your argument. We always appreciate it when counsel are concise. You have some rebuttal time left, Counsel. Okay. Mr. Staples spoke of the devastating effect that an injunction might have on his client, and I would suggest that we don't know yet what the injunction is going to say. Again, Tillamook's a small town. It would be the last thing in the world Kramer would want to do is to drive Smoker out of business. An injunction can be crafted to ameliorate a harm to Smoker. The problem we have is that Smoker's using a mark that Tillamook owns that's confusingly similar, has been shown to be, or at least there's enough evidence of it that a fact finder could so find, in the same channels, and this has been for the first time. With respect to the standard of review, I won't quibble with counsel, but I submit that mixed questions of fact and law, such as whether or not there's been an infringement on a trademark, are generally reviewed de novo, and this Court has said and other courts have said that trademark infringement cases are notoriously resistant to summary judgment. Moving on to the request for admission and what it was that Kramer said, I believe Judge Hawkins, you're correct, that if the admission is construed as Smoker would like to have it, this does give the case away all the more reason to use and to be aware of the maxim that an admission in order to be used against a party must be clear and unequivocal, and to say that there was essentially no infringement before 1998, which has been our core contention all along in that admission, is to say that what we were intending, rather than to say there was no likelihood of confusion whatsoever until about 1998. So I think, again, if you'll look at our reply brief, which I think points out the logical fallacy of what Smoker and the Court are arguing here, you'll find that the judicial admission was not what they made it out to be. Again, this is a case that comes before you on summary judgment. The inferences from the evidence that the district court drew were improperly drawn. The judgment should be reversed and the case sent back for further proceedings. Thank you. Okay. Thank you, Keith. I'll thank both sides for their arguments. It's a very interesting case. The case just argued will be submitted for decision, and we'll proceed to the last case on this morning's calendar.
judges: Hawkins, Silverman, Gould